Raymond E. Aldrich, Jr., J.
Involved herein are two proceedings, heretofore consolidated for joint trial (56 Misc 2d 454) charging a 15% year-old-boy with being a juvenile delin *640 quent under the Family Court Act, by virtue of intentionally causing the death of his mother and his maternal grandmother by shooting them with a .22 caliber rifle on March 7, 1968 at the family home.
Petitioner has been represented by the Assistant County Attorney, and the respondent by a Law Guardian who has had extensive experience in civil and criminal law, for the prosecution as a former District Attorney of Dutchess County and for the defense since his leaving public office, and they both most competently and ably represented their respective parties. Fact-finding hearings were conducted over 7 days, 19 different witnesses testified, and 47 exhibits were introduced into evidence.
The respondent entered a general denial to the allegations of the petitions and the affirmative defense of insanity at the time of the alleged acts upon which the petitions rest.
The evidence indicates, and this court so finds that the respondent was born on September 1, 1952, and on March 7, 1968, resided with his mother, father and grandmother on Mountain Road in the Town of Milan, Dutchess County; that on March 7, 1968, the mother of the respondent was killed at her home at approximately 5:35 p.m. by three bullets fired from a .22 caliber Savage rifle which belonged to the brother of the respondent, and that the grandmother of the respondent was killed shortly thereafter in the home by two bullets fired from the same gun; that the .22 caliber rifle is a semi-automatic, in which each round from the clip is automatically fed and the spent shell ejected, the rifle not firing until the trigger is depressed, such manual operation being necessary to fire the gun each time; that around noontime on March 7,1968, respondent’s brother, who lacked 20 days of having reached his majority, and who had been in the Marine Corps for two and one-half years, then home on leave after seeing combat in Vietnam for 10 months, took the gun and fired 50 rounds in target practice, and after finishing, put the.gun on the enclosed porch of the home without having attached thereto a clip of unspent shells; that the bullets and clips for the gun were kept separately in the brother’s bedroom; that respondent was familiar with the use of firearms, and according to his father and brother was a very good marksman; that respondent’s brother, who was going to the Pine Plains School to inquire about an award he had won before entering service, was asked by the mother to ascertain whether the respondent was then in the eighth grade or in the ninth grade as he had indicated to her; that the brother was advised by the principal, and the school records *641 so indicated, that respondent was repeating the eighth grade for the third time; that about 3:30 that afternoon the brother intercepted respondent as he was getting off the school bus, and while driving him home, revealed he knew the respondent had failed again and was repeating; that respondent became upset at this revelation, asked his brother not to tell his mother, and expressed concern as to what action his father would take, and the brother tried to reassure respondent that his father would not hurt him; that when the two brothers arrived home respondent told his mother of his failing the eighth grade and again repeating, whereupon the mother berated him, then slapped him across the face; that at about 5 p.m. the brother left to pick up his father in Kingston, but before he went he asked respondent several times to accompany him, but respondent declined, indicating he wanted to “ think ” about what ho was going to tell his father about his scholastic failure; that when the brother drove away in the family’s only car, respondent was in the living room sitting on the couch, the mother had exited from the front door, had walked outside along the walkway, and was proceeding to enter a side door to go into the wash room, and the grandmother was in her bedroom; that at approximately 6:30 p.m., the brother and the father returned to the home, observed no lights, entered the house, and found the mother dead, lying on her back on the enclosed porch, then went to the grandmother’s room where they found her dead, lying on the bed, and at that time the respondent was not at home; that the brother then noticed his rifle was missing from the porch where he had put it and there were spent and live .22 caliber shells lying about on the floor of the house; that respondent was apprehended by a State policeman in Pine Plains at 8:20 p.m. that night and put in a police car which then proceeded westerly on route 199; that at about 8:30 p.m., the car was intercepted by another police car containing two State troopers and respondent was transferred to this car and seated in the back Avith one trooper Avhile the other drove; that Avhile the latter car Avas proceeding, respondent directed the officers to a location alongside an unnamed dirt road in a dense wooded area approximately 150 to 200 feet from its intersection Avith Indian Road, Avhich location AAras approximately one-half mile from respondent’s home, Avhere the .22 caliber rifle from Avhich the bullets Avere discharged into the bodies of the mother and the grandmother Avas found stuck in the snoAV butt doAvn; that at about 9:00 p.m. respondent Avas taken to the State Police barracks in Rhinebeck and thereafter, in the presence of his brother, he Avas interrogated, and signed a four-page statement *642 to the effect that he had shot his mother and grandmother on March 7, 1968 at the home with the said .22 caliber rifle; that the taking of the written statement began at 9:42 p.m. and ended at 11:00 p.m. ; that after this written statement was executed, the respondent was fingerprinted, and one latent print found on the stock of the rifle is identical with the left little fingerprint of the respondent; that the respondent is of normal intelligence, capable of doing grade work above the eighth grade, has good immediate memory, and is verbally capable with little confidence.
The Law Guardian raises the point that oral statements given by respondent to the two police officers in the car involving admission of the crimes and direction as to the location of the gun on the dirt road at least one-half mile from the house were involuntary statements, taken in violation of the boy’s constitutional rights, and in violation of section 724 of the Family Court Act, and accordingly the fruits of any such statements should not have been introduced into evidence. To resolve this contention we must examine the evidence. When respondent was apprehended in Pine Plains by the first State trooper, he. was advised of the four-fold Miranda warnings, such as his right to remain silent, warned that anything he said could be used against him, advised of his right to have an attorney present, and warned that if he had no money, an attorney would be obtained for him, and upon respondent stating that he did not want to talk, there was no conversation between the officer and him. When he was turned over to the two officers in another car, still in handcuffs, and he sat in the rear, he was again advised by an officer of the same four-fold Miranda warnings. After this was done, some time interval later, the boy volunteered the inquiry whether his mother and grandmother were dead and admitted he shot them. No questions were asked of him up to this moment. When asked by the officer where he put the gun, he responded that he could not tell them but he would take them there, which he did. His offer to direct them to the location of the gun was made after he was advised of his rights, and after he inquired about the deaths and admitted he had caused them. At no time in the car was respondent questioned about the actual commission of the crimes themselves. The admission to the shooting was a spontaneous statement, not taken during the act of questioning, and there is no evidence in the record to indicate that any of the respondent’s oral statements were the result of coercion, threats, promises, guile or subtle inducement of any nature. This court does not believe the mere fact of handcuffs on the boy at that time, under *643 the evidence in this casé, bfotight forth involuntarily an admission of such gravé Import as to committing the crimes and location of the gun. Accordingly, all motions of the Law Guardian addressed to stich oral statements are denied.
The Law Guardian also contended that the four-page written statement of March 7, 19b8 taken between 9.42 p.m. and 11:00 p.m. was an involuntary act and taken in violation of section 724 of the Family Cotirt Act. Petitioner presented no eye witness to the actual killings. The only detailed description Of what did transpire at the home after the brother left to pick Up his father in Kingston is this fotir-page statement of the respondent detailing his movements from that time, which was received into evidence, and is the only Avritten statement so introduced, and henceforth in this decision when the court refers to “ the written statement the court alludes to this four-page statement dated March 7, 1968 in evidence.
Objection made to the written statement was firstly that it was taken in violation of subdivision (a) of section 724, of the Family Cotirt Act, because the respondent’s father was not immediately notified of the boy’s being taken into custody or present when it wUs taken, and secondly that it Avas taken in Violation of subdivision (b) of said section in that the location where the questioning leading td the taking of the Avritten statement, namely the State Police barracks in íthinebeck, is not a facility designated by the Appellate Livision, Second Lepartment, as a suitable place for the questioning of children.
As to the first objection, the evidence indicates that the father Was asked by an officer to accompany him to the barracks so the boy could be interviewed and a statement taken, and that he responded that he did not want to go but that respondent’s brother would gO instead. While the father and the brother Suggested the father was distraught and really incapable of making a decision, the evidence indicates he was not hysterical nor overcome with grief, although he was then lying on a bed in the continuous presence of ati adult neighbor, and the testimony further indicates that the father suspected, respondent of being involved in the acts of killing. When the officer asked the father to go to the barracks he had been with him five minutes, respondent’s brother was hi the room, and he conversed with his father and he admitted volunteering to go in his father *s place, and he did go. Considering also that these Cases involved situations svhere the mtirdet victims were members of the same household, ohe was his wife, and the acts were Committed in the house, it is Understandable that when the father returned and fotind the victims and respondent, his son, *644 absent, that under these circumstances he would not want to personally accompany the officer to the barracks. Under the evidence in these proceedings this court finds the provisions of subdivision (a) of section 724 of the Family Court Act were satisfied.
As to the second objection to the written statement that it was taken in violation of subdivision (b) of section 724 of the Family Court Act, it is conceded that the written statement was taken in the State Police barracks in Ehinebeck and that this location is apparently not a facility designated by the Appellate Division, Second Department as a suitable place for the questioning of children. At the barracks respondent was taken to a room which had an office-like atmosphere, which has not been characterized as a police station house with its accompanying barred windows, cell blocks or similar obvious detention facilities inhabited by uniformed officers. When his brother arrived, respondent was transferred to another office, typically furnished with desk and chairs, where the respondent was questioned by an ununiformed officer. In Matter of Addison (20 A D 2d 90) and in Matter of Gregory W. (19 N Y 2d 55) questioning at an undesignated facility was not disapproved, and under the evidence in this case, considering the location to be the barracks, this court finds substantial compliance with subdivision (b) of section 724 of the Family Court Act. Accordingly, all motions of the Law Guardian addressed to the written statement being taken in violation of the provisions of said section are denied.
The written statement is an essential portion of the proof as to determine whether the respondent did or did not do the alleged acts, and the decision now made is predicated upon the admissibility of such written statement. If the written statement was given involuntarily, then the court must ignore it; by the same token, if it was freely and voluntarily given, then the statement should be considered with the other proof. The evidence indicates that respondent was fully advised of the four-fold Miranda warnings in an office in the barracks, and these were then repeated in another office to which he was taken, all in the presence of his brother, and up to this time, he had not been questioned; that at no time did respondent ask that the questioning be stopped, or that he have an attorney, or that his father be present. The brother testified that respondent answered the questions put to him in a very clear, calm tone without hesitation, and neither the brother or the respondent at any time requested that the questioning discontinue. In fact, the brother stated that he could speak to the respondent at any *645 time during the questioning, furthermore that respondent was never threatened in any manner, and that in his opinion, his brother was always treated fairly. The evidence does not suggest the slightest physical mistreatment or threats, promises of leniency, prolonged or excessive interrogation by teams of experienced police officers, or intolerable questioning conditions, which would render the taking of such a written statement involuntary. This court does not believe that this 15%-year-old boy, in the continual presence of his brother, made the written statement other than as a voluntary act with full knowledge and awareness of its import. The written statement is amply corroborated by the evidence since the corpus delicti is proved.
The taking of the fingerprints immediately followed the taking of the written statement by a matter of minutes and was consented to by the respondent, fully aware of his privilege to refuse", done in the presence of his brother, and the reasoning applied to the admissibility of the written statement is applied to these prints. Accordingly, the motion of the Law Guardian to exclude the prints from evidence is denied.
The Law Guardian pleads as an affirmative defense the insanity of the respondent at the time of the alleged commission of the acts upon which the petitions are based, and if this defense is valid, the respondent cannot be found to have, with intent, caused the death of his mother and maternal grandmother (Penal Law, § 125.25). If the respondent, as a result of mental disease or defect, lacked substantial capacity to know or appreciate either: (a) the nature and consequence of such conduct; or (b) that such conduct was wrong, then he would not be criminally responsible for conduct, which if done by an adult, would constitute the crime of murder (Penal Law, § 30.05). The psychiatrist for the respondent examined him on two occasions, on March 28 and 31, and he diagnosed him as suffering from a psychopathic personality condition which resulted in a psychotic episode causing the deaths by shooting. Such condition has been held not to immunize a person from criminal responsibility under section 1120 of the former Penal Law (People v. Wood, 12 N Y 2d 69). The psychiatrist further claimed that at the time respondent lacked substantial capacity to understand the nature of the acts or that they were wrong, averring that while respondent pulled the trigger and realized what he had done, he did not understand the significance of the acts. The psychiatrist called by the petitioner testified conversely that respondent did have substantial capacity to know and appreciate what he was doing, and that it was wrong; that in his opinion respondent was not suffering from a psychopathic *646 personality, although he had certain psychopathic traits which might be the forerunner in the future for a definite diagnosis of psychopathic personality, or are traits commonly seen in a pre-psychotic personality, which has not reached its full bloom, or a conduct disorder with psychopathic traits which may lead to a psychopathic personality, or a conduct disorder which respondent may inst outgrow. Both psychiatrists found respondent not to tie psychotic, and neither psychiatrist found respondent suffering from hallucinations, obsessions or delusions, nor was he an epileptic, a neurotic or schizophrenic, and neither saw the need for taking an electroencephalogram, or X-rays to determine organic disturbances. While respondent may have sustained some trauma to the head during his earlier years, as have most children, at no time was he hospitalized or given medical attention for any such incidents, and he always attended school without apparent disability.
The evidence indicates that after the brother left to pick tip his father, the respondent wanted to stay and 1 ‘ think ’ ’ about what he was going to tell his father, made himself a cup of coffee, then played a record, and after going to the far bedroom and loading a clip of Í0 bullets, he sat for about 10 minutes on the couch reflecting; that he then fired at least once at his mother who was outside, striking her, and after she gained entrance through the front door, snot at her at least twice, striking her, and then, upon hearing the grandmother yelling from her room, went and pulled the trigger twice, shooting her. Then he proceeded to give his mother some water and went to the mother’s purse and took the money. Before he left the house he dialed the operator for an ambulance so as to give directions. He deliberately hid the gun in the woods, and upon observing the ambulance he hid, but when he ascertained it was going in the wrong direction, he ran out to the road, met the ambulance, and directed it on the right course. As he was fleeing and a car would approach, he would hide.
thorn the totality of the evidence, this court concludes that respondent did intentionally ■ cause the deaths of his mother and his maternal grandmother by shooting them with the .22 caliber rifle introduced in evidence, and at the time that he did so, he was not acting under the influence ot extreme emotional disturbance for which there was a reasonable explanation or excuse, and further that he did hot have such a mental disease or defect that he lacked substantial capacity to know or appreciate either the nature or consequence of his conduct or that such conduct was wrong.
*647 By virtue of the foregoing findings, this court determines the allegations of petitions D-228-68 and D-229-68 have been established by a preponderance of the evidence, and the court finds the respondent is a juvenile delinquent in each of them respectively in that:
1. Respondent, on or about March 7,1968, at about 5:35 p.. m., at Mountain Road, Town of Milan, Dutchess County, New York, did an act, which if done by an adult, would constitute the-crime of murder (Penal Law, § 125.25) in that the respondent at said time and place did intentionally cause the death of his mother, Stella Turner, by shooting her with a .22 caliber rifle.
2. Respondent, on or about March 7, 1968, at about 5:35 p.m., at Mountain Road, Town of Milan, Dutchess County, New York, did an act, which if done by an adult, would constitute the crime of murder (Penal Law, § 125.25) in that the respondent at said time and place did intentionally cause the death of his maternal grandmother, Nettie Brennan, by shooting her with a .22 caliber rifle.
3. Respondent was a person under 16 years of age at the time of each of the aforesaid acts.
An order of adjudication in accordance with the foregoing findings is forthwith made in each of the fact-finding hearings in these two consolidated proceedings.