OPINION OF THE COURT
George L. Jurow, J.
The four juvenile respondents before this court — Kenneth C. (13); Kevin J. (14); Rodney M. (12); and Miguel O. (11) (ages at time of alleged incidents) — are charged with, during May 27, 1983 and May 29, 1983, acting in concert with each other and with two adults, Pedro Alarcon, and Jose Delapaz, unlawfully entering Public School 377 in Brooklyn and committing acts of vandalism resulting in substantial damage to the interior of the building and its contents. The specific acts charged include, burglary in the third degree, criminal trespass in the third degree, and criminal mischief in the second, third, and fourth degrees.
It is acknowledged that the school break-in resulted in substantial media publicity. In addition, a $1,000 reward had been offered for information leading to the apprehension of the perpetrator(s).
The four juveniles were arrested on or soon after midnight, June 1, 1983, following an all-day investigation by detectives operating out of the 83rd Police Precinct in *230 Brooklyn. The arrests followed alleged oral confessions made by the four juveniles to detectives at the precinct. In addition 3 of the 4 juveniles subsequently provided confessions in video taped form to an Assistant District Attorney in the early morning hours of June 2, 1983.
Following arraignment, all four respondents moved to suppress their oral and video taped confessions as involuntarily made, and not the product of a knowing, intelligent, and voluntary waiver of their rights to counsel and to remain silent. Petitioner Corporation Counsel (the “presentment” or prosecuting agency) conceded that sufficient grounds existed to warrant a hearing on the suppression motions (see People v Huntley, 15 NY2d 72) and a Huntley hearing was begun in the fall of 1983.
The testimony focused on two broad issues: First, were the confessions themselves voluntarily made? Second, because the confessions were obtained at the 83rd Precinct, and because each of the respondents came to be present at the precinct through varying efforts and participation of the precinct detectives, respondents challenge the legality of the police conduct in obtaining their presence at the precinct. The latter issue is necessarily a proper subject of inquiry in a Huntley hearing because, as noted in People v Misuis (47 NY2d 979, 981) “Clearly, statements obtained by exploitation of unlawful police conduct or detention must be suppressed, for their use in evidence under such circumstances violates the Fourth Amendment [citing Dunaway v New York, 442 US 200]. It is therefore ‘incumbent upon the suppression court to permit an inquiry into the propriety of the police conduct’ * * * Unless the People establish that the police had probable cause to arrest or detain a suspect, and unless the defendant is accorded an opportunity to delve fully into the circumstances attendant upon his arrest or detention, his motion to suppress should be granted”.
PLACE OF QUESTIONING
Respondents’ claim that in violation of the then-applicable section 724 (subd [b], par [ii]) of the Family Court Act (now § 305.2, subd 4, par [b]) they were not questioned in the room designated by the Appellate Division for the questioning of juveniles. The credible evidence indicates *231 that, however, with the exception of the first confession of respondent C., the juveniles were questioned in and the confessions obtained in the room properly designated by the Appellate Division.
Respondent Kevin J.’s exhibit B, in evidence, consists of a certified order of the Appellate Division indicating that at the time of questioning the designated area for questioning of juveniles at the 83rd Precinct was the “Community Assistance Office, Room 108, 1st FL”. Petitioner’s photo exhibit 2N, in evidence, indicates that room 108 at the 83rd Precinct was labeled the “Juvenile Interrogation Room” (by sign), and was identified by Detective Sanchez as the juvenile interrogation room, and by Assistant District Attorney Wiseman as the juvenile room where he obtained the video taped confessions. In addition, Detective Cardi testified he obtained the nonvideo confessions in the “Juvenile Room”.
Some ambiguity concerning what room at the precinct was utilized arose because the detective witnesses referred also to a “Juvenile Area” which was described as consisting of three adjacent and almost identical rooms known as, respectively, the “Juvenile Room”, the “Community Affairs Room”, and the “Lieutenant’s Locker Room”. The ambiguity arises because the Appellate Division designation refers to a “Community Assistance Office, Room 108”. However, because the evidence indicates that, with the exception of C.’s first confession, the respondents were all questioned in room 108, the ambiguity appears to relate to changes in the names of the rooms at the precinct (some of which had multiple uses and labels) rather than a change in the actual room designated in the Appellate Division order.
However, in the instance of C.’s first confession Detective Sanchez acknowledged that it was not obtained in the juvenile interrogation room (room 108). It appears that, while C.’s confession was obtained in a room located in the “Juvenile Area”, it was most likely obtained in a room adjacent to room 108, known as the community affairs office. The question is whether the failure to initially question C. in the properly designated room, in this instance, makes C.’s first confession inadmissible as a *232 matter of law. For the reasons noted below, this court holds that this defect does not render C.’s confession inadmissible.
In Matter of Emilio M. (37 NY2d 173), under circumstances where the Appellate Division had not yet designated any facilities in the First Department for the questioning of children, the court noted that precise compliance with the Family Court Act was not possible, and noted (p 177) that “since there is no evidence of willful or negligent disregard of the statutory requirements in this case and no evidence of inattention to such requirements as a pattern or practice, no sufficiently useful prophylactic purpose would be served in penalizing the police for failure to conform to the terms of the statute taken literally.” The few other lower court decisions on this point are divided. In Matter of Matthew F. (87 Misc 2d 644) the court required literal compliance with the statute and excluded a confession not taken in the authorized room. In Matter of Turner (56 Misc 2d 638) the court accepted a statement taken in an “office-like atmosphere”, although it was not the authorized facility.
Although the instant case can be distinguished from Emilio M. (supra) in that the Appellate Division had made a designation, it is also true that the pattern of police conduct by the detectives of the 83rd Precinct similarly did not indicate a willful or negligent disregard of the statutory requirements. Rather, the mitigating factors in this case included, first, the fact that respondent C. was questioned in a room virtually identical and adjacent to the designated room; second, that the room, although not the designated room, was in an area removed from public access and not used for the detention of adult defendants (that is, the basic policies underlying the designation of separate juvenile interrogation rooms were adhered to; cf. Uniform Family Ct Rules, 22 NYCRR 2503.1); third, that a multiple number of juveniles were at the precinct for questioning at approximately the same time; and fourth, in all instances, save one, the detectives did conform to the statutory requirement.
Under the circumstances of this case, for the court to adopt a per se exclusion rule would be to exalt form over *233 substance and, as the court noted in Emilio M. {supra, p 177) would serve no “useful prophylactic purpose”. Accordingly, this court holds respondent C.’s first confession to be admissible, notwithstanding the fact that it was not taken in the specific designated room for juvenile questioning.
KENNETH C. CONFESSIONS
Two confessions were obtained from Kenneth C., a first oral confession taken at the 83rd Precinct on the evening of June 1, and a.second video taped confession taken at 3:45 a.m. on the morning of June 2.
Respondent challenges his confession mainly on the basis of the length of time C. was in the hands of the police, combined with the fact that C. had a relatively low I.Q., resulting in confessions that were supposedly the product of fatigue, pressure and incapacity to exercise free will in waiving his rights and voluntarily making the statements. These arguments deserve close scrutiny because of C.’s juvenile status, the length of time he spent with the police, and his arguably limited intelligence. A careful scrutiny of the credible evidence, however, does not sustain C.’s arguments.
Respondent C.’s presence in the company of the police during June 1 and June 2 was unique, in relation to his corespondents. In contrast to the other juveniles, who were all located and brought to the precinct in one manner or another by the police, C. spent much of the day of June 1, and perhaps into the early evening hours as well, as a cooperating volunteer witness for the police. With the apparent motive of attempting to claim the $1,000 outstanding reward for information about the break-in, C. voluntarily went to Public School 377 and then to the 83rd Precinct during the morning of June 1 with a story of having witnessed the break-in and having seen seven perpetrators whom he could identify. From noon until 3:30 p.m., while the police continued their investigation, C. was not in police custody. The police returned to C.’s house around 3:30 p.m. and asked C. and his parents’ permission to have him return to the precinct to further assist the police. There is no evidence at this point that suspicion was focusing on C. C. returned voluntarily to the precinct.
*234 It appears that the police first became suspicious of C.’s story when, in the early evening, they released the last of the seven suspects initially named by C. in the morning and more particularly, when Pedro Alarcon implicated C. and the other juveniles in the break-in. C. nonetheless continued to assist the police by locating Rodney M.’s home. When C. then returned to the precinct, his parents were notified, and then C., in the presence of his father, was given Miranda warnings by Detective Sanchez. Sanchez testified, credibly, that he read each of the required Miranda warnings from a card (introduced by petitioner’s exhibit 1), as well as the question asking whether the subject was willing to answer questions, and that after each question both C. and his father answered “yes”. C. then proceeded to make a statement indicating that he, along with the three juvenile corespondents, and the two adults then in custody (Pedro and Jose) broke into and vandalized the school. C’s statement provided some degree of detail as to who did what while in the school. Although the exact time of the first oral confession is not clear (it was apparently some time between 9:30 p.m and midnight), the second video taped confession was made at 3:45 a.m., June 2. By that time C. had been with the police for some 12 hours, although as a suspect for some 7 to 8 hours.
The video taped confession was played before the court. The recording was in color, and was exceptionally clear, both visually and audibly. The recording reveals that Assistant District Attorney Wiseman clearly and properly administered each of the required Miranda warnings and the waiver question to both C. and his father, who both said they understood each warning, and each agreed to answer questions. In response to several questions by Wiseman, C. provided details concerning the break-in and vandalism, similar in content to his first confession.
Although length of interrogation and custody is clearly a factor in determining voluntariness, People v Anderson (42 NY2d 35) and People v Leonard (59 AD2d 1) both related to lengthy and intense periods of custodial interrogation. Unlike both cases, C. was not questioned continuously and intensely while in police custody; unlike Anderson, C. was not denied access to his family; and unlike Leonard, C.’s *235 interrogation was not “suggestive” and his responses were not “parroted”.
A viewing of the tape clearly rebuts defense contentions that, compounded by the late hour and length of time in police custody, C.’s confession was the product of fatigue, confusion, pressure, or any other elements of involuntary response. Both C. and his father were alert and appeared to clearly understand the warnings given. The waiver of rights was also clearly provided by both father and son. More significantly, the court had an excellent opportunity to observe C. and assess his condition when he provided his statement. Some of the confession was provided in narrative form and, including its factual detail, indicated C. was composed, coherent, and articulate. Not only was there no evidence of fatigue, but if anything C. appeared to be hyperalert and vigilant during the taped confession. There were no signs of weariness or of pressure with respect to either C. or his father.
The viewing of the taped confession, taken a number of hours after the initial oral confession, supports the view that C.’s earlier mental, emotional, and physical condition was, if anything, equally if not more satisfactory than later, and further attests to the finding of voluntariness concerning the first confession.
C.’s father testified that, around the time of C.’s first statement, C. was pressured by the detectives who behaved in an overbearing if not overtly threatening manner. The court, in observing the testimony of all the detectives involved, as well as Mr. C.’s testimony, finds this testimony not credible and instead credits the prosecution’s witnesses who denied such coercion.
C.’s final contention is that his intellectual capacity is so severely limited so as to make an intelligent, knowing, and voluntary waiver of his rights impossible under these circumstances. In support of this contention, defense counsel introduced in evidence C.’s exhibit A-l consisting of a two-page psychological evaluation of C. prepared by a school psychologist who tested C. in October, 1983. It should be noted that the author of the report was not called to testify, nor was the report prepared for the purpose of determining C.’s ability to understand and waive his Mi *236 randa rights. Accordingly, the court does not give significant weight to the report.
The court also notes that although some parts of the psychological evaluation are consistent with C.’s position, other parts are less so. Although the report describes C. as having a low verbal I.Q. (64), and describes him as “Easily influenced especially by those in positions of perceived authority”, he is also described as having a higher “performance” I.Q. (86), “good tolerance for frustration”, “eager to please and quite responsive to attention” and as having “evidence of near average intellectual potential.” Although there is no doubt that the report points towards specific learning disabilities, it does not negate C.’s capacity to understand and waive his Miranda warnings, particularly in the presence of a concerned parental adviser. It might also be noted that this respondent, despite his acknowledged learning disabilities, was able to formulate a plan to collect a reward and provide the police with an account of a crime that took a team of veteran detectives more than half a day to begin to challenge.
The law is clear that low intelligence is but one factor to be taken into account in the totality of circumstances of custodial interrogation, and that individuals with borderline or impaired intellectual functioning may be perfectly capable of knowingly, intelligently, and voluntarily waiving their Miranda rights. (See People v Kelly, 67 AD2d 1009 [“extremely low intelligence quotient, bespeaking some degree of mental retardation”]; People v Chaffee, 42 AD2d 172,173 [“score of 70 on an intelligence test indicating) that he is in a mentally defective or mild mental retarded or borderline intelligence group”]; People v Lux, 34 AD2d 662 [“score of 77 on an I.Q. test and of 83 on a Wechsler Test * * * dull-normal or borderline range of intelligence”]; contra People v Bruce, 62 AD2d 1073 [I.Q. of 59; but with expert testimony by psychologist as to capacity to waive rights].)
In sum, the court finds beyond a reasonable doubt that the prosecution has met its burden of proving that both of C.’s confessions were made voluntarily, after a knowing, intelligent, and voluntary waiver of his constitutional rights.
*237 MIGUEL 0. CONFESSIONS
Miguel O. provided two confessions at issue. The first oral confession was taken by Detective Cardi at approximately 1:00 a.m., June 2. The second confession, taken by Assistant District Attorney Wiseman in video taped form, was provided at 3:05 a.m. on June 2.
In contrast to the taped confessions of Miguel O.’s two corespondents, noted above, O.’s taped confession revealed an unusual — and fatal — defect in the administration of the Miranda warnings. The court will review this taped confession first, before dealing with the prior oral confession.
As was the case with the other taped confessions, this video tape played before the court was in color, and was visually clear. However, because of the presence during the interrogation of a Spanish interpreter, involving a simultaneous Spanish translation on the tape, it was necessary to play the recording several times before the Spanish portions on the tape were clear and audible to the Spanish interpreters present in court.
Throughout the hearing, Miguel O.’s mother, Ms. C., was assisted by the presence of an official court Spanish interpreter. The court was also advised, prior to the playing of the video tape, that the taped questioning of Miguel O. occurred with his mother present, as well as a Spanish interpreter (who turned out to be a detective) who translated Assistant District Attorney Wiseman’s questions into Spanish for Ms. C.’s benefit. Based on these circumstances, the court directed that two official court Spanish interpreters be present in court when the taped confession was played: one, to continue translation of the court proceedings for Ms. C., and the other to listen to the tape and to, first, certify that any translation of English/Spanish by the detective interpreter on the tape was accurate, and second, to translate any Spanish on the tape that might not have been translated on the tape. The decision to have two interpreters before the court while the recording was played proved to have been a most prescient precaution, as later revealed when the recording was played.
When the tape was played, there was some initial dispute as to whether the Miranda warning concerning the *238 provision of an attorney if respondent could not “afford” counsel, was translated accurately. The tape was played several times before this matter, which was ultimately resolved in favor of the accuracy of the translation, was settled. The real problem occurred, however, later in the tape, following Assistant District Attorney Wiseman’s warning that respondent could refuse to answer questions and could pick and choose which questions he might choose to answer. Wiseman then asked whether the respondent, and his mother, understood. At that point, Ms. C. appeared to make a comment in Spanish that was not translated on the tape itself. After this portion of the tape was played several times in court, both official Spanish court reporters present concurred that what Ms C. said was as follows: “I don’t understand much, but if he does * * * Because it’s the first time I find myself in this * * * Answer whatever questions they are asking * * * Don’t look at me for help”. Rather than halting the questioning at that point, or stopping to clarify the circumstances for Ms. C., Assistant District Attorney Wiseman continued to complete the remaining Miranda warnings and waiver question, and then elicited a confession (in English) from the respondent.
It appears from the tape that the Assistant District Attorney failed to stop the questioning, following Ms. C.’s comment, either because he failed to realize that an untranslated comment was being made, or if he so realized, he failed to inquire of the detective interpreter what the nature of that comment was. Whatever the reason for the failure to halt the questioning at that point, it is clear that this failure resulted in a fatal defect in the administration of the Miranda warnings: First, it is clear from the literal translation of the mother’s remark that she was not comprehending the meaning of the warnings at that point, and was also indicating that she was unable to provide parental assistance for her son. Second, the court’s observation of Ms. C. on the tape, at the time she made the above remark, revealed that, simultaneously with making the comment, she shrugged and looked toward her son in what was, to the court, a clear posture of resignation. This body posture, of abdication and resignation, was consistent with her translated remarks of not comprehending what the Assis *239 tant District Attorney was saying, and of giving up the task of assisting her son.
It can be argued that the failure to strictly comply with section 724 of the Family Court Act (now § 305.2), concerning both parental notification and the actual presence of a parent during juvenile interrogation is but one factor to be considered in assessing the voluntariness of a juvenile confession. (See cases collected in People v Castro, 118 Misc 2d 868; cf. Fare v Michael C., 442 US 707.) However, this court need not resolve this “per se” versus “totality of the circumstances” approach in this context. It is clear that New York has conformed more closely to a rule requiring strict adherence to parental notification and assistance during juvenile interrogation. (See Matter of Michelet P., 70 AD2d 68.) Even under a totality of circumstances approach, this court would hold that an 11-year-old juvenile who is being questioned late at night at a police station, in the presence of a parent, and whose parent indicates during the administration of the Miranda warnings that she is confused, does not understand the warnings, and can no longer assist her child, cannot be said, as a matter of law, to make an ensuing confession that is knowing, intelligent, and voluntary. To reiterate, this is not a case in which the police made all possible efforts to notify a parent or guardian and obtain their presence during juvenile interrogation, but could not do so because of circumstances totally beyond police control, but rather is a case in which a parent was present but was unable to assist her child during interrogation because of a failure of a police interpreter in conjunction with an Assistant District Attorney to take action, within their control, to rectify parental confusion in order to ensure that the parent present during interrogation understood the nature of what was going on. This is a failure that must be attributed to the prosecution and is necessarily a fatal defect in the securing of Miguel O.’s second confession.
The court next turns to the question of Miguel O.’s first confession, apparently taken at 1:00 a.m., two hours before the video taped confession.
Detective Cardi testified that he took the first statement in the juvenile room from O., with O.’s mother present. *240 Cardi testified that he administered each of the Miranda warnings and the waiver question from his card, and that the respondent and his mother replied affirmatively to each question. In contrast to the taped session, no interpreter was present, and the warnings were administered in English only.
Ms. C. testified to two facts: First, she does not speak or understand English, and did not on June 1 and June 2, 1983. Second, she denied she was present at all during any oral statement her son may have made to Detective Cardi. Ms. C.’s testimony is in direct conflict with that of Detective Cardi.
In assessing this conflict in testimony, the court notes that both Detectives Cardi and Medina made an in-court identification of Ms. C. as having been present during her son’s initial confession. The court also notes Ms. C.’s testimony, on cross-examination, that she emigrated to the United States when she was 20 years old, and has been in the United States for the past 19 years.
In its review of the conflicting testimony between Detective Cardi and Ms. C., the court found Detective Cardi’s testimony (supported by that of Detective Medina) credible. That is, the court finds that the Miranda warnings and waiver questions were properly administered and were responded to by “yes” answers by both respondent and his mother. The court does not believe Ms. C.’s testimony that she was not present during the first interrogation. Moreover, although the court believes, based on the credible evidence, that Ms. C.’s understanding of English is poor, and that she does generally need the aid of an interpreter, the court finds it doubtful that she understands no, as opposed to some, English, given her length of resident time in this country. The credible evidence supports the conclusion that Ms. C. was present with her son during the first interrogation by Detective Cardi, and that she did respond to the warnings as described by the detective. However, this does not end the inquiry concerning the voluntariness of the first confession.
The failure by the police to provide an interpreter for Ms. C. during the first confession raises a reasonable doubt as to whether she had a sufficient understanding of the *241 warnings and their meaning to have been able to act as a parental adviser to her son. It is likely, based on the testimony, that Ms. C. may have been somewhat duplicitous, in leading the police to believe she understood what was transpiring; on the other hand, the police may well have been derelict in not making an effort to assess her need for an interpreter (which requirement they seem to have agreed upon — belatedly — by the time of the later taped interrogation). Regardless of the levels of responsibility involved, it is clear from the totality of the circumstances — in particular, the mother’s language difficulty, and confusion about the warnings during the second interrogation — that she could not have had the requisite understanding of what was taking place at a similar interrogation, taken only two hours earlier, and without an interpreter present. Even if Ms. C. was less than candid concerning the degree of her language difficulty, and so initially misled the police, any such deception, whether intentional or inadvertent, did not rise to the level of obviating the obligation of the police under these circumstances to have inquired further of Ms. C.’s need for an interpreter during the first interrogation, and to have provided an interpreter, as proved so necessary during the second interrogation.
This court therefore finds that the mother of respondent O., though present at his first interrogation, could not have sufficiently comprehended the Miranda warnings and waiver question, so as to be able to provide the necessary parental guidance and assistance to her son. As was the case with respect to Miguel O.’s second confession, and for the similar reasons discussed above, this defect renders his first confession fatally defective as well. (See Matter of Michelet P., supra.)
In sum, both confessions of respondent Miguel 0. must be suppressed since, as a matter of law, they were involuntary and not the product of a knowing, intelligent, and voluntary waiver of his rights.
THE “ARREST” ISSUES
Respondents each claim that, regardless of the voluntariness of the confessions themselves, the police illegally arrested (seized or detained) them, and that such illegal *242 police conduct invalidates any subsequent confessions. These claims involve a number of related subissues, namely, whether the respondents were in fact arrested, whether probable cause for any arrest existed, and if any respondent was in fact illegally arrested, whether such illegality tainted the subsequent confessions.
The general legal principles governing respondents’ claims are easy to state. The police may not seize a suspect, transport him to a police station, and detain him there for custodial interrogation without probable cause. (Dunaway v New York, 442 US 200.) The police are, absent exigent circumstances, also prohibited from making a warrantless entry into a suspect’s home in order to make a felony arrest, regardless of the existence of probable cause. (Payton v New York, 445 US 573.) However, there is no illegality if a suspect is found to have voluntarily come to the police station. (Oregon v Mathiason, 429 US 492; People v Yukl, 25 NY2d 585.) Similarly, Payton is not violated if a suspect voluntarily consents to allow the police to enter his home. (Cf. Schneckloth v Bustamonte, 412 US 218.) If the prior police conduct proves to have been illegal, the question then becomes whether the subsequent confession is sufficiently “purged” of the initial illegal taint, or instead is a product of exploitation of the illegality. (Wong Sun v United States, 371 US 471; Brown v Illinois, 422 US 590; Rawlings v Kentucky, 448 US 98.)
Although these general principles may be well settled, it is their application to specific complex fact patterns that proves difficult.
The circumstances of how each of the four respondents came into police custody, and to the station house differ widely, and must be examined in detail with respect to each respondent: Miguel 0. was located on the street by the police and taken to the precinct by car; the police first spoke to Rodney M. in his apartment after gaining entry from his parent, and then took him to the precinct by car; Kenneth C. had been with the police initially as a volunteer witness, but at some subsequent point became a suspect; and finally, there is no evidence in the record as to the specific circumstances under which Kevin J. was taken to the station house.
*243 A. PROBABLE CAUSE
However, a threshold issue that will be examined first, since it has a bearing on the consequences of the police conduct with respect to each of the respondents, is the question whether the police ever obtained probable cause to arrest any of the four respondents, and if so, when.
The record indicates that the police spent most of the afternoon of June 1 locating and questioning the seven “suspects” first named by Kenneth C. in the morning as the perpetrators he (along with the other five “witnesses” he said he was with) had seen commit the break-in. These suspects were released by 7:30 p.m. that evening. It is not clear exactly when the police began to doubt C.’s story and suspect him, and by implication, the other “witnesses”, although it appears to have been around 7:00 p.m., as the seven initial suspects were being released. However, Assistant District Attorney Wiseman testified that he went to the precinct in the early evening and spoke to C. as a “witness”, out of concern that the information C. provided earlier, which was the basis for questioning the initial seven suspects be verified. After speaking to C., Wiseman testified that he then asked the police to speak to the other “witnesses” C. said he was with to “find out whether or not they ‘corroborate’ C.’s story”.
Detective Sanchez corroborated Wiseman’s testimony that the police acting at his direction tried to locate the other “witnesses” C. stated were with him. Sanchez testified that Pedro Alarcon was brought in first and questioned. The critical testimony concerning the probable cause question was provided by Detective Medina, whom the court found to have been a credible witness.
Medina testified that Alarcon, some time between 6:00 p.m. and 8:00 p.m., admitted to Detectives Sanchez and Medina that he, and the four juvenile witnesses named by C. were the persons who broke into and vandalized the school. It is clear from this testimony, which was corroborated by the other prosecution witnesses, that Alarcon’s statement implicating himself and the four juvenile witnesses was made prior to the detectives’ locating and bringing the three juvenile witnesses (other than C., who was already at the precinct) to the station house. The issue *244 is the relevance of Alarcon’s statement with regard to the question of probable cause.
Probable cause has been generally defined to be “that quantum of evidence which would warrant a person of reasonable caution in believing that the suspect had committed or was committing an offense * * * Tn dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act’ * * * far less proof than is required for conviction * * * but it still requires more than mere suspicion”. (People v Laskaris, 82 AD2d 34, 38-39, and cases cited therein.)
The issue of whether probable cause to arrest or search exists when the context involves information provided by an informant has been the subject of prominent litigation. (See Illinois v Gates, 462 US 213, substituting a “totality of circumstances” test concerning anonymous informants in place of the prior rules in Aguilar v Texas, 378 US 108; and Spinelli v United States, 393 US 410, utilizing the so-called prongs of “basis of knowledge” and “veracity” [the latter involving credibility of informant or reliability of information].)
Regardless of the difficulties with respect to determining probable cause with respect to information provided by anonymous informants, United States v Harris (403 US 573) and related cases, make it clear that so-called “admissions against interest” by disclosed informants may reasonably be the basis for probable cause. As noted in Harris (p 583), “People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility — sufficient at least to support a finding of probable cause”. Although there has been concern that Harris should not be applied to anonymous or undisclosed informants (as the dissenting opinion so pointed out) this caveat does not exist when the informant is known to the police, as was the factual situation in Harris itself. In a fact situation where a participant in a crime names his accomplices, and in addition, does so somewhat “spontaneously” *245 (that is, shortly after coming into police custody), the information has been deemed to be particularly reliable and supportive of a finding of probable cause. (See United States v Barfield, 507 F2d 53; United States v Ashley, 569 F2d 975; United States v Trice, 476 F2d 89; Dutton v Evans, 400 US 74.)
The circumstances of Pedro Alarcon’s confession, implicating himself and the juvenile respondents in this case, plainly fall within the rationale of Harris (supra) and its progeny. Alarcon’s confession was obviously against penal interest; his identity was, of course, known to the police; and his confession took place very soon after he came into police custody. Although the Court of Appeals has declined to consider the effect of Gates (supra) on New York State (see People v Landy, 59 NY2d 369; cf. People v Elwell, 50 NY2d 231), the rule in Harris and its related cases, concerning declarations against interest by an identified informer, has been applied in New York. (See People v Wolzer, 41 AD2d 679.)
Counsel for respondent Kevin J., however, challenges the reliability of Alarcon as an informant citing testimony (by Detective Medina) that Alarcon had told them that C. had property hidden underneath his bed belonging to the school, that the police asked for and received permission to look under C.’s bed, and thereafter searched and found nothing. However, this fact does not undercut Alarcon’s reliability since, as noted in LaFave, Search and Seizure (vol 1, § 3.3 [d]) probable cause to search often presents a distinct question from probable cause to arrest, because the former concerns a prior rather than presently existing situation that often involves stale information. Accordingly, considerable weight must be given to Alarcon’s confession as an admission against penal interest, in contrast to Alarcon’s statement, which should be given little weight, that several days after a burglary stolen property may still be remaining in the possession of another participant.
In sum, the court therefore finds that in the early evening hours of June 1 the police had probable cause to arrest at least 3 of the 4 juvenile respondents, namely, Kenneth C., Miguel O. and Rodney M. However, with respect to *246 Kevin J., the probable cause issue is more complicated and will be discussed further below, because of lack of information as to how J. came into police custody. In addition, the existence of probable cause is not dispositive of the claimed illegality that a Payton violation occurred when the police took Rodney M. to the precinct. To dispose of these and other remaining issues, the court must examine the circumstances concerning how each of the four respondents came into police custody.
B. CUSTODIAL CIRCUMSTANCES
1. Rodney M. Custody
Even though the court finds that the police, specifically Detectives Sanchez and Medina, at the time they went to Rodney M.’s apartment, had probable cause to arrest him (based upon the Alarcon confession; see above), the existence of probable cause is not dispositive of the defense contention that the detectives violated Payton v New York (445 US 573, supra) by making a warrantless entry into the apartment.
The prosecution contends that the detectives were admitted on consent to the apartment and that M. thereafter voluntarily accompanied the detectives to the precinct. (Cf. Oregon v Mathiason, 429 US 492, supra.) Both Detectives Sanchez and Medina testified in detail concerning the entry to the M. apartment and to the circumstances surrounding the taking of M. to the precinct. Careful scrutiny of their testimony, which the court found to be credible, indicates, and the court so finds, that the entry of the detectives into the apartment and the subsequent taking of M. to the station house was consensual and voluntary.
Both detectives testified that they went to the building where M. lived, identified themselves as police officers to M.’s mother in the hallway of the building, asked permission to enter the apartment, and were so given permission. The detectives testified that, after being admitted to the apartment, they observed that the respondent appeared “very nervous and almost began crying”. Medina testified that he was concerned that M. would “make a statement”, and for that reason suggested to Sanchez that he provide Miranda warnings and that Sanchez did so with respect to *247 the respondent and his mother. The detectives advised them that they wanted to speak with M. because he was a witness to a school burglary. Sanchez testified that he then requested Ms. M.’s permission to take her son to the station house, and that she gave permission and told her son to go.
Respondent contends that, because of his juvenile status, upset emotional condition, as well as his mother’s pregnant condition, the entry to the apartment and subsequent taking of the respondent to the station house was not consensual, but rather constituted a submission to overbearing coercive police pressure and authority. In support of this position, respondent cites Sanchez’ testimony that, had respondent or his mother refused permission for him to go to the precinct, he would have brought them to the station house in any event. Respondent further contends that Ms. M. was never advised of her right to refuse consent to entry to the apartment. Finally, respondent contends that the detectives acknowledged that M. was considered to be “in custody” when he was in their car being transported to the precinct.
Notwithstanding these defense contentions, the court finds that, based on the totality of the credible testimony, the entry and subsequent taking of respondent to the station house was consensual. The court makes this finding of consent, cognizant of and applying the premise that the burden of proof in showing a consensual waiver of constitutional rights rests heavily upon the prosecution. (People v Whitehurst, 25 NY2d 389; People v Rodriguez, 11 NY2d 279; Schneckloth v Bustamonte, 412 US 218, supra.)
Whether an arrest or seizure has taken place, or whether an individual voluntarily consents to accompany officers, can be a close question. As an extreme example of how troublesome this question can be, see the multiple opinions in United States v Mendenhall (446 US 544) as to whether a “seizure” took place between Federal drug officials and defendant in an airport context. Despite the difficulties this question can pose, a number of factors have been identified as relevant to whether voluntary consent has been obtained. As noted in Schneckloth v Bustamonte (supra) this question depends upon the totality of the-“unique facts and circumstances of each case”. Case law has identi *248 fled a number of critical factors as relevant to whether voluntary consent has been obtained in a Fourth Amendment context. (See, generally, 2 LaFave, Search and Seizure, § 8.2.)
In terms of the application of these factors to this factual context, most important is the fact that the credible evidence indicates to the court that the two detectives refrained from any display of force or coercion. Although Schneckloth (supra) cautioned that account must be taken of what it called “subtly coercive police questions, as well as the possible vulnerable subjective state of the person who consents”, the evidence indicates that not only did the police seek respondent’s and his mother’s permission for the entry and subsequent taking to the precinct, but that at all times they did so courteously and without any display of official threat or coercion. Second, although respondent was in an emotionally upset state, the detectives appeared sensitive to his condition and acted, not only to prevent an incriminating statement by administering Miranda warnings, but also with the intention of “easting] him and his mother”. Although the administration of Miranda warnings (the application of a Fifth Amendment warning, in a Fourth Amendment context) does not and should not negate otherwise substantial evidence of coercion, it is one factor among the totality of circumstances bearing on the validity of consent. (See 2 LaFave, op. cit., § 8.2 Q].) Third, the evidence indicates, not that Ms. M. acquiesced to coercion, or that she was in a highly vulnerable emotional state, but rather that she was in control of her faculties and responses. In this connection, it should be noted the uncontroverted testimony of Detective Medina that Ms. M., although nervous, displayed annoyance not so much in relation to the police officers but in relation to her son’s situation. Fourth, the police indicated to respondent and his mother that they considered him to be a witness to a crime, notwithstanding the fact that they actually possessed probable cause to make a street arrest. The court finds that this statement was conveyed in good faith, rather than with deceptive intent. It should” be noted here that the test of whether probable cause to arrest exists is an objective one, and does not *249 depend upon an officer’s subjective judgment as to whether probable cause actually exists. (See United States ex rel. Senk v Brierley, 381 F Supp 447; United States v Day, 455 F2d 454.) Fifth, the fact that respondent or his mother were not specifically advised of their right to refuse consent is not controlling. (See Schneckloth v Bustamonte, supra.) Sixth, the fact that Sanchez testified that he would have taken the respondent to the station house if he had refused to go, or that Medina believed respondent to be “in custody” when he was in the police vehicle, are also not controlling. (People v Korsing, 71 AD2d 628; cf. People v Bryant, 71 AD2d 564.) In this connection, the court also gives weight to the testimony of Detective Medina, supportive of the noncoercive actions of the two detectives, regardless of their subjective beliefs, that what action the detectives would have taken in the event of a refusal of the request to come to the station house was a “bridge” they did not have to cross.
In sum, the court finds that the totality of the circumstances indicate that the police entry to the M. apartment and his subsequent transport to the station house was based upon voluntary consent.
Even if it were established that there was a violation of Payton (supra) related to the police conduct in entering M.’s apartment and transporting him to the precinct, a finding the court does not so make, it would still have to be determined whether such antecedent illegality tainted the respondent’s subsequent confession. Under principles of attenuation, as they have so evolved from Brown v Illinois (422 US 590, supra) through Rawlings v Kentucky (448 US 98, supra) and considering the related New York cases, the court would conclude that any such primary Fourth Amendment violation was attenuated and would not invalidate M.’s subsequent confession. Under Brown, the Supreme Court noted four factors in assessing taint: whether Miranda warnings were given, the temporal proximity of the arrest and the confession, whether any circumstances intervened between the initial illegality and the later statements, and the purpose and flagrancy of the official misconduct.
As applied to the circumstances of respondent M., the court notes that Miranda warnings were provided; that the *250 confession occurred a number of hours after the entry into the apartment; that respondent’s father went to the precinct and was present to assist his son before and during the questioning; and that even if a Fourth Amendment violation were to be found, any such violation, under these specific circumstances, cannot be fairly labeled as flagrant. With respect to the latter criterion, see People v Graham (90 AD2d 198) calling attention to the factor of the degree of police misconduct, a factor given increasing weight in Rawlings (supra). (See, also, People v Matos, 93 AD2d 772; cf. People v Anthony, 93 AD2d 892 [in which the statements appear to have been made shortly after arrest, in contrast to M.’s confession here which was made a number of hours later].)
In sum, the court finds that the police did not illegally arrest or seize M., because the police conduct in entering M.’s apartment and subsequently transporting him to the station house was based on consent. Moreover, even if one reached a different conclusion concerning the arrest and transport and were to find a Fourth Amendment violation, any such violation was attenuated and did not taint the later confession.
2. Kevin J. Custody
The legal questions surrounding Kevin J.’s arrival at the station house present unusual problems. The major problem relates to the atypical circumstance that, as the prosecution concedes, the record does not reflect how J. came to be present at the station house on the evening of June 1. What minimal information is in the record was provided by Detective Sanchez who testified that J. “was brought by another detective” but that “I don’t know his name”. Detective Medina also testified that he did not bring J. in, nor did he know who did. Respondent’s mother, Ms. J., who testified, did not appeár to know how her son got to the station house, and provided no information about this question; respondent himself did not testify.
There are three specific issues raised. First is the question whether an arrest, or seizure, was actually made; second is the question of whether probable cause existed for any arrest made; third is the question whether, if an *251 arrest was made without probable cause, were the later two confessions by J. tainted by the prior illegality.
The threshold question is whether there was an actual arrest, seizure, or otherwise involuntary transport of J. to the station house, or whether it can be claimed that in the absence of information to the contrary, that J. can be presumed to have gone to the station house voluntarily. (Cf. Oregon v Mathiason, supra, with Dunaway v New York, 442 US 200, supra.)
Where the prosecution has not come forward and shown the circumstances of how a respondent was brought to the station house by the police, and the respondent has similarly provided no evidence of same, allocating the burden of proof on this question between prosecution and defense becomes critical.
In general, most jurisdictions have placed the burden of proof concerning the legality of a warrantless arrest on the prosecution. This view, which makes a distinction between warrantless arrests and arrests pursuant to a warrant, assumes that a presumption of legality can be made if the police act with a warrant, but that if they do not, there can be no such presumption. An additional consideration is that the evidence relating to the circumstances of the arrest is believed to be more within the control of the prosecution. (See Beck v Ohio, 379 US 89; United States v Impson, 482 F2d 197; United States v Ventresca, 380 US 102; Commonwealth v Antobenedetto, 366 Mass 51.)
The New York rule allocating burden of proof is consistent with this general prevailing practice insofar as it requires the prosecution to bear the burden of “going forward” to initially show the légality of challenged police conduct, although New York does place the ultimate burden of proof on the defense. (People v Malinsky, 15 NY2d 86; People v Whitehurst, 25 NY2d 389, supra; People v Berrios, 28 NY2d 361; People v Wise, 46 NY2d 321.)
In this case, the prosecution could demonstrate nothing more than the bare fact that an unnamed precinct detective brought respondent J. to the station house. The acknowledgement itself by the prosecution that respondent was brought in by a detective suggests the likelihood that *252 an arrest, or seizure, took place. In terms of any prosecution contention that an arrest or seizure may not necessarily have occurred, without more, the prosecution cannot meet its burden of going forward to demonstrate that fact. Further support for the court’s conclusion that — on this record — the prosecution must be bound by a finding that an arrest took place, is that any argument to the contrary involves an implicit claim that respondent consented and voluntarily accompanied the police to the station house. Not only is the prosecution usually held to a higher standard of proof when contending that an arrest, or search, is based on consent (People v Whitehurst, supra; cf. Bumper v North Carolina, 391 US 543) but where a juvenile is the subject of police transport to the station house, the probability is substantial that the juvenile’s transport was involuntary, rather than consensual.
In sum, because the prosecution has failed to show the circumstances under which the anonymous detective brought J. to the station house, and therefore cannot show that J. consented to accompany the detective or came voluntarily, this pickup and transport to the precinct must be deemed by the court to have constituted an arrest or seizure, within the meaning of the Fourth Amendment. (Cf. Dunaway v New York, supra.)
Given that the court finds J. to have been arrested when he was taken to the station house, the court now turns to the question of whether the police had probable cause to make this arrest. As noted above, the burden of going forward is on the prosecution to show the existence of probable cause in this warrantless arrest context.
The prosecution contends that, although the exact time J. came into custody cannot be pinpointed, it was subsequent to Pedro Alarcon’s confession which implicated himself and the juveniles, including J., and that this confession constituted probable cause for any later arrest of J. Although the evidence indicates that the detective who went out to pick up J. did so subsequent to Alarcon’s confession implicating J. (see discussion above, regarding the circumstances of the Alarcon confession) the prosecution’s contention that this was sufficient to supply probable cause for the J. arrest is incorrect.
*253 As a general rule, police are often entitled to rely upon communications or directives from superiors or other officers to make an arrest, particularly when the source of the information (although not the arresting officer himself) possessed probable cause for an arrest. (See Whiteley v Warden, 401 US 560; United States v Ashley, 569 F2d 975; People v Lypka, 36 NY2d 210.)
However, the fact that certain detectives at the 83rd Precinct, namely, Detectives Sanchez and Medina, had probable cause to arrest respondent J. (based on their hearing the Alarcon confession) does not mean that this predicate constituted so-called “probable cause at the source” to enable a never-identified detective to arrest respondent J. The problem, which negates any conclusion of probable cause, is that there is no evidence that the unidentified detective who went out and picked up J. was ever given a directive to do so by either Sanchez or Medina, or that he was given any of the information Sanchez or Medina possessed. Thus, none of the information possessed by Sanchez or Medina, though it amounted to sufficient probable cause as to these two detectives, can be properly imputed to the unidentified detective who located respondent J. In other words, the requisite “nexus” between the probable cause at the source, and the subsequent action by the unidentified detective, is lacking. This lacking connection or “gap” is fatal to the prosecution’s claim that they had probable cause to arrest J. (See Salter v State, 163 Ind App 35; State v Mickelson, 18 Ore App 647; United States v Woods, 544 F2d 242.)
Therefore, this court concludes that J. was arrested or seized illegally, without probable cause, and brought to the station house for custodial interrogation in violation of Dunaway v New York (supra). The final question becomes, did this prior Fourth Amendment violation taint J.’s two later confessions?
In general, once taint has been demonstrated, the burden should be on the prosecution to show that the later confessions were “sufficiently an act of free will to purge the primary taint”. (See Brown v Illinois, supra, p 598.) As with respondent Rodney M., above, the analysis must similarly look at the principles of attenuation as originally *254 set forth in Brown, and elaborated on in Rawlings v Kentucky (supra) as well as the New York cases. As set forth in Brown (supra), the four critical factors include whether Miranda warnings were provided; the temporal proximity of the arrest and the confession; the presence of intervening circumstances; and particularly, the purpose and flagrancy of the official misconduct.
As applied to respondent J.’s circumstances, the evidence indicates that in terms of time he was most likely brought to the precinct between 8:00 p.m. and 10:00 p.m. on June 1. The exact time of J.’s first confession is uncertain, but appears to have been around midnight or perhaps as late as 1:30 a.m., June 2. The video confession was provided at 3:25 a.m,, June 2. Factors supporting attenuation of the earlier illegal arrest and transport include, first, a gap of, most likely, two or more hours between arrival at the precinct and the first confession, and of approximately 5V2 to IV2 hours in terms of the second taped confession; second, the provision of Miranda warnings on the occasions of both confessions; third, the continuous presence of respondent’s mother, who he was not with at the time of the arrest at the precinct; and fourth, circumstances indicating that the police illegality was not flagrant.
The latter point is important and requires further elaboration. In Brown (supra), and most recently, in Rawlings (supra) the Supreme Court cited the ‘“purpose and flagrancy of the official misconduct’ ” (448 US, at p 109), as of particular significance. The complicating factor in assessing the “flagrancy” of the police misconduct is that the exact circumstances of J.’s arrest and transport are not known. Even if the ultimate burden of proof is placed on the prosecution to demonstrate that the police conduct was not flagrant, as opposed to requiring the respondent to demonstrate that it was (it is arguable whether the burden on this point should be more properly shared with respondent since respondent may have equal access with the police to elements such as coercion, abuse, threat, etc.), the court concludes that the prosecution has met that burden: First, J.’s arrest was almost certainly a warrantless street arrest, and not a more serious Payton violation involving physical entry into his home. Second, at the time J. was *255 arrested on the street, several detectives responsible for most of the investigatory work that day, specifically, Sanchez and Medina, possessed probable cause for J.’s street arrest at the time he was in fact arrested. Although the court noted that the Fourth Amendment was nonetheless violated in that the existence of probable cause could not be imputed to the actual (unknown) detective who made the arrest, this is not a case, for example, of “sweep” arrests absent probable cause, condemned in Davis v Mississippi (394 US 721) or a case in which the police at their central source rounded up a suspect on a fishing expedition, without any evidence connecting him to a crime being investigated. The Fourth Amendment violation, as explained above, was by definition serious, but under these circumstances cannot be characterized as flagrant. Finally, as respondent’s mother herself testified, she saw no evidence and had no reason to believe that her son had been physically abused by the police, and the record indicates no such misconduct. In sum, the totality of these circumstances enables the court to find that J.’s later two confessions were purged of the initial taint of his prior illegal arrest. (See, also, People v Graham, supra; People v Matos, supra; cf. People v Anthony, supra.)
ORDER
For the foregoing reasons, the respondents’ motions to suppress are decided as follows: Miguel O.’s motion to suppress both his first oral and second video taped confession is granted, as to both confessions. Kenneth C.’s motion to suppress both his first oral and second video taped confession is denied, as to both confessions. Kevin J.’s motion to suppress both his first oral and second video taped confession is denied, as to both confessions. Rodney M.’s motion to suppress his oral confession is denied.
The case is referred back to Part V for assignment of a trial date.
[Portions of opinion omitted for purposes of publication.]